UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DR. CATHERINE WILKERSON,

     Plaintiff,

                                Case No. 09-14558

v.                               Hon. Lawrence P. Zatkoff

KEVIN WARNER, JANET CONNERS,
MICHAEL MATTHEWS, MARK WEST,
DEAN LLOYD, DR. ROBERT DOMEIER,
and HURON VALLEY AMBULANCE, INC.,
jointly and severally,

     Defendants.

_____/

**OPINION AND ORDER**

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on March 29, 2012

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

**I. INTRODUCTION**

This matter is before the Court on three motions for summary judgment filed by the

following defendants, each of which has been fully briefed:

    1.     Janet Conners, Michael Matthews and Mark West (Docket #40);

    2.     Dean Lloyd, Dr. Robert Domeier and Huron Valley Ambulance, Inc. (Docket #42);
          and

    3.     Kevin Warner (Docket #44).

In addition, Plaintiff has filed a motion to amend complaint (Docket #39), which also has been fully

briefed.  The Court finds that the facts and legal arguments are adequately presented in the parties'

papers such that the decision process would not be significantly aided by oral argument.  Therefore,

pursuant to E.D. Mich. L.R. 7.1(f)(2), it is hereby ORDERED that the motions be resolved on the briefs submitted. For the following reasons, all three motions for summary judgment are GRANTED and the motion to amend is DENIED.

## II. BACKGROUND

On November 30, 2006, a student group sponsored a controversial speaker at the Michigan League, on the campus of the University of Michigan, Ann Arbor. Various individuals, including Plaintiff, showed up to protest the speech (the "Tanter Speech"). During the course of the Tanter Speech, certain individuals heckled the speaker. Ultimately, officers from the University of Michigan Department of Public Safety ("UMDPS") removed some protesters from the audience. During the course of the removal, one of the protestors, Blaine Coleman ("Coleman"), was taken to the floor in a hallway adjoining the room where the Tanter Speech was being held. Coleman's hands were cuffed behind his back by UMDPS officers, including Defendant Janet Conners ("Conners")[1] and Defendant Mark West ("West").

At about the same time, Plaintiff, a medical doctor, left the Tanter Speech and went into the hallway. Plaintiff observed Coleman being guarded/restrained/evaluated by UMDPS officers, including Conners and West. Plaintiff believed that Coleman was injured, and after she represented that she was a doctor (but did not give her name, identify what type of physician she was or provide credentials), Conners and West allowed Plaintiff to take Coleman's vital signs. Plaintiff also asserts

---

[1] The Court notes that two persons discussed in this Opinion have similar names: Janet Conners, an officer with the UMDPS, and Margaret Connors, a prosecutor with the Washtenaw County Prosecutor's Office. Throughout this Opinion, UMDPS Officer Janet Conners shall be referred to as "Conners," whereas the Court will identify the Washtenaw County prosecutor by her full name, Margaret Connors.

that, from that point on, she continuously gave or attempted to give medical advice and that she requested that the handcuffs be removed from Coleman.  Coleman's handcuffs were not removed pursuant to Plaintiff's requests.  Numerous individuals from the protest group and others had gathered in the general area around Coleman, and the police, including Defendant Kevin Warner ("Warner") of the Ann Arbor Police Department ("AAPD"), established a line to keep the crowd back from the Coleman.

An emergency medical unit from Defendant Huron Valley Ambulance, Inc. ("HVA"), having been requested by UMDPS officers, arrived minutes after Plaintiff first observed Coleman being subdued/treated by West and Conners.  The HVA team was led by Defendant Dean Lloyd ("Lloyd"), the senior HVA medical team member.  From the time the HVA team arrived, Plaintiff consistently and unsolicitedly communicated verbally her opinions about the necessary medical treatment and what she thought the HVA emergency personnel was doing wrong.  Plaintiff never asked to assume Coleman's care, nor did she have any pre-existing physician-patient relationship with Coleman. From all accounts, the HVA emergency medical personnel believed Coleman was faking unconsciousness.  On two occasions, Lloyd broke an ammonia capsule under Coleman's nose. When Lloyd used a third ammonia capsule, Plaintiff testified that Lloyd cupped his hands over the protester's nose and mouth and stated, "You don't like that, do you?"  As the ammonia capsules were being used, Plaintiff repeatedly demanded that Lloyd stop, exclaiming that Lloyd's actions "were not efficacious and were punitive."

At some point shortly thereafter, Lloyd yelled, "Get her [Plaintiff] out of here."  According to Plaintiff, despite the fact that she was voluntarily leaving the scene by that point, Warner grabbed her, pushed her against the wall, twisted her arm and took her into a stairwell where he detained her

3

for as long as 30 minutes. Plaintiff states that while Warner led her to the stairwell, Warner continued to twist Plaintiff's arm despite her pleading that: (1) she had a bad left shoulder, (2) what he was doing was extremely painful, and (3) she was willing to do whatever he wanted if he would let go of her left arm. After approximately 20 minutes of detention by Warner,[2] Conners (the ranking UMDPS officer at the scene) approached Warner and Plaintiff. Conners asked Plaintiff if she would like to make a statement. After Plaintiff responded that she did not wish to make a statement, Conners gave Plaintiff Conners' business card and told Plaintiff to call her if Plaintiff wanted to make a statement. Conners then told Plaintiff that Plaintiff could leave. Plaintiff testified at her deposition that Warner continued to detain her for another 10 minutes before she left the Michigan League, without further incident. Plaintiff was not handcuffed or arrested at any time while she was at the Michigan League that day.

Commencing on the evening of November 30, 2006, and continuing for many weeks following the incident (through December 2006 and in January 2007), Plaintiff engaged in public criticism of the University of Michigan and its personnel, the UMDPS and AAPD officers, and the HVA personnel for the following circumstances at the Tanter Speech and the events surrounding the treatment of Coleman, herself and others in the hallway outside the room where the Tanter Speech was being held (collectively, the "Coleman Incident"):

    (a)    improperly removing the protestors from the Tanter Speech in the first place,

    (b)    treating the protesters with excessive force resulting in injury,

    (c)    improperly treating an injured protester (Coleman), and

---

[2]In the course of that 20 minutes, HVA personnel removed Coleman from the Michigan League and took him to the University of Michigan Hospital. The record does not reflect any additional information regarding Coleman's condition or treatment.

    (d)      improperly removing, detaining, physically injuring and retaliating against Plaintiff for:

         (1)     her criticism of the way that the police and the paramedics were acting, and

         (2)     attempting to live up to her ethical duty to be of assistance in a medical situation.

In addition, on or about January 16, 2007, Plaintiff filed a citizen's complaint against Warner.

Defendant Michael Matthews ("Matthews"), a detective with the UMDPS, was assigned to investigate the events surrounding the Tanter Speech and Coleman Incident, an investigation that included a review of police reports prepared by Warner, West, Conners and others.  On January 2, 2007, Matthews filed a request for warrant with the Washtenaw County Prosecutor's Office, wherein he sought charges against Plaintiff for attempted resisting and obstruction of Warner and the HVA personnel.  Matthews provided the Washtenaw County Prosecutor's Office with a package of all police reports and other relevant documents.  On January 23, 2007, the Washtenaw County prosecutor issued a misdemeanor complaint against Plaintiff with two charges, including one count for attempted assault, resisting and obstructing Warner and one count for attempted assault, resisting and obstructing HVA personnel (including Lloyd).

At some point after the Coleman Incident but prior to May 10, 2007, HVA made a determination to remove ammonia inhalants from all of its vehicles.  That change in procedure was communicated from Defendant Dr. Robert Domeier ("Domeier"), the Medical Director of the Washtenaw/ Livingston Medical Control Authority, to Matthews on May 10, 2007, as reflected in an email of the same date from Matthews to the Washtenaw County prosecutor handling the case at that time (Margaret Connors):

       Hi Margaret

5

> Just for info, I received a call back from Dr. Domeier today
> concerning [Plaintiff]. I'm not sure it is a 'protect a fellow Dr. thing'
> or what but Domeier indicated that they (HVA and him) would be
> removing the inhalants from the ambulances. . . .
>
> Mike

Although Plaintiff maintains that this information was not communicated to her by the Washtenaw

County prosecutor or Matthews until her trial in November 2007, Plaintiff filed a motion to dismiss

the criminal complaint against her shortly after Matthews' May 10, 2007 email to Margaret Connors.

In July 2007, the district court judge conducted a hearing on Plaintiff's motion to dismiss the

criminal complaint. The district judge denied Plaintiff's motion to dismiss. Ultimately, Plaintiff

went to trial by jury, and she was found not guilty of both counts on December 3, 2007.

## III. LEGAL STANDARD

**A.      Summary Judgment**

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[T]he plain language

of Rule 56[] mandates the entry of summary judgment . . . against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial."). A party must support its assertions by:

> (A) citing to particular parts of materials in the record, including
> depositions, documents, electronically stored information, affidavits
> or declarations, stipulations (including those made for purposes of the
> motion only), admissions, interrogatory answers, or other materials;
> or
>
> (B) showing that the materials cited do not establish the absence or

> presence of a genuine dispute, or that an adverse party cannot
> produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

The moving party bears the initial burden of demonstrating the absence of any genuine dispute as to a material fact, and all inferences should be made in favor of the nonmoving party. *Celotex*, 477 U.S. at 323.  The moving party discharges its burden by "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citing *Celotex*, 477 U.S. at 325)).

Once the moving party has met its initial burden, the burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[T]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## B.     Qualified Immunity

The application of the doctrine of qualified immunity is a question of law. *Siggers-El v. Barlow*, 412 F.3d 693, 699 (6th Cir. 2005).  Qualified immunity is a defense available to government officials that shields them from personal liability when performing discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Everson v. Leis,* 556 F.3d 484, 493 (6th Cir. 2009). *See also Sallier v. Brooks*, 343 F.3d 868, 878 (6th Cir. 2003) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800,

818 (1982)). The chief "[c]oncern of qualified immunity is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." *Dorsey v. Barber,* 517 F.3d 389, 394 (6th Cir. 2008). In other words, the qualified immunity doctrine "protects all but the plainly incompetent or those who knowingly violate the law." *Id.*

Once a defendant raises a qualified immunity defense, the plaintiff bears the burden of establishing that the defendant is not entitled to qualified immunity. *Everson,* 556 F.3d at 494. A defendant enjoys qualified immunity on summary judgment unless the facts alleged and the evidence produced, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established. *See Jones v. City of Cincinnati,* 521 F.3d 555, 559 (6th Cir. 2008) (citing S*aucier v. Katz,* 533 U.S. 194, 201 (2001)); *Williams v. Mehra,* 186 F.3d 685, 691 (6th Cir. 1999). If a plaintiff satisfies her burden, a defendant can still prevail on a defense of qualified immunity if he can showing that his actions were objectively reasonable in light of the existing law at the time of the action. *Mehra,* 186 F.3d at 691.

The Sixth Circuit has developed a three-step analysis for reviewing district court decisions on qualified immunity. *See Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003). First, the Court is to determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiff show that a constitutional violation has occurred. *Id.* (citing *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (*en banc*)). Second, the Court is to consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. *Id.* A right is "clearly established" if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." A*nderson v.*

8

*Creighton,* 483 U.S. 635, 640 (1987). Thus, the relevant inquiry is "whether it would be clear to a reasonable offic[ial] that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202. Third, the Court is to determine whether the plaintiff has offered sufficient evidence "to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Feathers*, 319 F.3d at 848 (citation omitted).

## IV. COUNTS I-III: ALLEGED VIOLATIONS OF CIVIL RIGHTS

In each of Counts I, II and III, Plaintiff asserts 42 U.S.C. § 1983 liability against one or more Defendants for violation of Plaintiff's civil rights. In order to prevail on a civil rights claim under 42 U.S.C. §1983, a plaintiff must establish: (1) a person acting under color of state law, (2) deprived plaintiff of a right secured by the U.S. Constitution or laws of the United States. *See, e.g.*, *Smoak v. Hall*, 460 F.3d 768, 777 (6th Cir. 2006). With respect to the second factor–whether Defendant(s) deprived Plaintiff of a constitutional right–the Court must analyze the claim in the context of a three-part test:

(a)    Was Plaintiff engaged in constitutionally protected activity?

(b)    Did the actions of the applicable Defendant(s) cause Plaintiff to suffer an injury that would "chill a person of ordinary fitness from" continuing to engage in that activity?

(c)    Did Plaintiff's exercise of the constitutionally protected activity, at least in part, motivate the adverse action of such Defendant(s)?

*Center for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 821 (6th Cir. 2007); *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (*en banc*). In addition, to the extent any claim is based on the filing of criminal charges against Plaintiff, Plaintiff must establish the absence of probable cause for pursuing the underlying criminal charges against her. *Hartman v. Moore*, 547

U.S. 250, 265-66 (2006).

**A.      Who is a State Actor?**

It is undisputed that Warner, Conners, West and Matthews are state actors.  Each of these Defendants is a police officer employed by the AAPD or UMDPS, both of which are governmental bodies.  Although Domeier offers a cursory argument that he is not a state actor, it is undisputed that he was the Medical Director of the Washtenaw/Livingston Medical Control Authority, an agency created by statute.  Accordingly, the Court concludes that Domeier was acting under color of law at all times relevant to this cause of action.

Lloyd, however, was employed by HVA, a private corporation.  As such, neither Lloyd nor HVA typically would be subject to Section 1983 liability.  In certain circumstances, however, a private actor can be subject to Section 1983 liability:

> Private persons, jointly engaged with state officials in the prohibited action, are acting "under color" of law for purposes of the statute.  To act "under color" of law does not require that the accused be an officer of the State.  It is enough that he is a willful participant in joint activity with the State or its agents.

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970).  *See also Cooper v. Parrish*, 203 F.3d 937, 952 n.2 (6th Cir. 2000) ("If a private party has conspired with state officials to violate constitutional rights, then that party qualifies as a state actor and may be held liable pursuant to § 1983.").  The U.S. Supreme Court has held that, in order to find a private person a state actor, a plaintiff must demonstrate that there was "such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Brentwood Academy v. Tenn. Secondary Sch. Athl. Assoc.*, 531 U.S. 288, 295 (2001) (citation omitted).

In this case, the Court finds that Plaintiff has not presented the Court with evidence that could establish a close enough nexus to support Section 1983 liability against Lloyd or HVA.  First,

10

there is no evidence that the services provided by HVA/Lloyd at the Coleman Incident were subject to the control or prerogative of any governmental entity or agent thereof - or vice versa.  The only connection between HVA/Lloyd and any governmental entity as it relates to the Coleman Incident is that UMDPS and/or AAPD officers at the Michigan League requested emergency medical responders to the scene and HVA was dispatched to the Michigan League.  There is no evidence whatsoever that HVA and/or Lloyd acted at the direction of, or in conjunction with, UMDPS and/or AAPD officers once HVA personnel arrived at the scene.

Likewise, there is no evidence to support Plaintiff's:

(1)     conclusory allegation in her Complaint that Warner and Lloyd acted "in concert" because Lloyd "direct[ed]" that Plaintiff be removed from the scene "because of her criticism of him" and Warner did, in fact, remove her, or

(2)     conclusory argument, literally limited to the following statement in her brief in opposition to Lloyd's summary judgment motion, that "Based on his actions directing Warner to 'get her [Plaintiff] out of here,' there can be little question that Lloyd was a state actor for purposes of § 1983."

These conclusory statements are not supported by the facts in the record - or by common sense.  The facts reveal only that Lloyd said, "get her out of here" and Warner ultimately removed Plaintiff from the hallway area where Coleman was being treated.  There is no evidence that Warner–or any other UMDPS or AAPD officer–had a duty to act upon statements made by Lloyd or any other HVA personnel at the scene.  Likewise, the Court is not aware of any authority that police officers have any duty to take orders or directives from civilians, including emergency medical personnel, and Plaintiff has offered no legal authority for its conclusory statement.  There also is no evidence that Lloyd, individually, or HVA personnel, generally, had **any** relationship with the UMDPS or the AAPD that could support a finding that Lloyd and/or HVA were "willful participant[s] in joint activity with the State [*i.e.*, UMDPS and/or AAPD officers]" in any activity, to say nothing of a

11

**joint** activity to deprive Plaintiff (or any other individuals) of her or their civil rights.

In her brief in response to the motion for summary judgment filed by HVA, Lloyd and Domeier, Plaintiff argues that she is not claiming that HVA is a state actor.  Instead, Plaintiff's theory of liability is that "HVA is vicariously liable [under Section 1983] for the wrongful acts of its employees under a theory of *respondeat superior*."  Plaintiff does not, however, offer any legal authority to support her theory that HVA could be liable for the alleged violation of Plaintiff's First and Fourth Amendment rights based solely on the actions of Lloyd–or how Section 1983 liability attaches to a private entity based solely on the theory of *respondeat superior*.  Accordingly, the Court rejects this "theory of Section 1983 liability" espoused by Plaintiff.

Accordingly, the Court concludes that neither HVA nor Lloyd is a state actor subject to Section 1983 liability with respect to Lloyd's (or anyone else's) activities pertaining to the Coleman Incident itself or the criminal charges filed against Plaintiff that arose out of the Coleman Incident. Therefore, for the reasons set forth above, the Court concludes that HVA and Lloyd are entitled to summary judgment with respect to Counts I, II and III.

**B.     Count I - Retaliation for Exercise of First Amendment Rights**

In Count I, Defendants' alleged retaliation against Plaintiff for exercising her First Amendment rights, Plaintiff identifies only Warner and Lloyd by name, yet she ultimately alleges that "as a result of the actions of the Defendants herein, Plaintiff suffered the damages set forth above."  Thus, the Court turns to whether any Defendant(s) "deprived [P]laintiff of a right secured by the Constitution or laws of the United States," specifically, the First Amendment, such that he or she may be subject to liability pursuant to Section 1983.

*1.     Constitutionally Protected Activity?*

12

Official reprisal for protected speech "offends the Constitution [because] it threatens to inhibit exercise of the protected right," *Crawford-El v. Britton*, 523 U.S. 574, 588 n.10, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998), and the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out[.] [*I*]*d*.

*Hartman*, 547 U.S. at 256. In Count I, Plaintiff asserts several occasions on which she exercised her First Amendment rights on November 30, 2006, throughout December 2006 and in January 2007.

Plaintiff first alleges that she had a "right to attend and protest the contents of the speaker's ideas at [the Tanter Speech at] the Michigan [League]." There is no dispute that such activity is protected by the First Amendment and, as such, is constitutionally protected activity. Upon reviewing Plaintiff's Complaint, her response briefs and the record, however, the Court finds that Plaintiff has not challenged the conduct of any Defendant *vis a vis* Plaintiff's attendance at the Tanter Speech, nor any First Amendment activity in which Plaintiff may have engaged as it relates to the Tanter Speech itself. Accordingly, the Court need not consider any such First Amendment activity in ascertaining the merit of Plaintiff's allegations in Count I.

Plaintiff next asserts that she had a right (and a duty) to protest alleged "mistreatment, punitive measures and medically contraindicated techniques being utilized by emergency medical personnel against the injured prisoner [Coleman] under the supervision of the police." Throughout her briefs, Plaintiff assumes that her comments to law enforcement officers and/or emergency medical personnel regarding the treatment of Coleman constituted protected speech under the First Amendment. For purposes of his summary judgment motion, Warner "concedes" that Plaintiff's comments to HVA personnel were protected under the First Amendment. Lloyd, HVA and Domeier, however, note that Plaintiff has not cited any authority for her presumed constitutionally protected authority to "protest" the medical treatment being administered by HVA personnel. Conners, West

13

and Matthews do not address the issue of whether Plaintiff's conduct and/or speech at the Coleman Incident scene was constitutionally protected activity. For the following reasons, the Court concludes that Plaintiff was not engaged in constitutionally protected activity when she protested the medical measures and techniques being utilized by HVA personnel on Coleman.

In a light most favorable to Plaintiff, her comments directed at officers and emergency medical personnel consisted of criticism for the manner in which such officers and emergency medical personnel provided medical attention to the injured person (Coleman) - as the officers and emergency medical personnel were treating him. Plaintiff has not offered any case law or other authority that supports a person's (including a physician's)[3] right to inject herself into the treatment of another person when such person is being medically treated at that time by emergency personnel or law enforcement officers. In fact, under Michigan law, such actions may constitute criminal behavior under M.C.L. § 750.81d, as discussed in detail in Section IV.C.1.a. below.

The Court first notes that, as HVA and its personnel (including Lloyd) are not state actors, Plaintiff's comments criticizing their actions was not protected by the First Amendment. Moreover, unlike the Tanter Speech, a public event at which any person had the right to assemble and speak, the treatment of the injured protester was an exclusionary event, as evidenced by the police line

_____

[3]Plaintiff has suggested on several occasion that she had a physician-patient relationship with Coleman and that she had assumed care for him once she took his vital signs. At her deposition, however, Plaintiff admitted that she did not: (1) "request to take over Coleman's care"; (2) have an established physician-patient relationship with Coleman; or (3) follow-up on his treatment after she left the Michigan League on November 30, 2006. Moreover, the Washtenaw/Livingston Medical Control Authority Policy and Procedure for "On-Scene Physician Interaction" requires a physician seeking to become involved with a patient's care to, among other things, identify herself and provide credentials to HVA personnel, as well as "verify to [the HVA team] either that she had an established physician-patient relationship with the patient, or willingness to assume responsibility for the patient and to accompany the patient to the hospital." Plaintiff did not satisfy any of those requirements.

14

established to hold persons back from the where Coleman was being treated (and detained).[4] Likewise, the active treatment of Coleman was not a public activity upon which contemporaneous criticism served any purpose other than to interfere with the medical treatment of Coleman by trained medical personnel, as evidenced by the enactment of M.C.L. § 750.81d.  For these reasons, the Court concludes, as a matter of law, that Plaintiff's criticism of the medical care rendered by law enforcement officers and emergency personnel was not speech protected by the First Amendment, *i.e.*, constitutionally protected activity.  Accordingly, to the extent Plaintiff's retaliation claim is based on her criticism of law enforcement officials and/or medical personnel contemporaneous with their rendering of medical treatment to Coleman, the Court holds that part of Plaintiff's retaliatory prosecution claim fails to state a claim upon which relief can be granted.

Plaintiff also asserts that her public comments regarding the Tanter Speech and the Coleman Incident made on the evening of November 30, 2006, during December 2006 and in January 2007 constitute speech protected under the First Amendment.  Plaintiff's comments included criticism of the manner in which: (a) law enforcement officials handled protesters, (b) officers and emergency personnel treated Coleman, and (c) she was treated by Lloyd and law enforcement personnel at the scene of the Coleman Incident.  The Court agrees that evidence in the record would allow a reasonable fact finder to determine that Plaintiff was engaged in constitutionally protected activity when she offered public criticism of government officials.  The law is well-established that comments regarding the performance of public officials are protected by the First Amendment. *See,*

---

[4] Notably, Plaintiff has not challenged, at the scene of the Coleman Incident or at any time thereafter: (1) the establishment of that police line, (2) that Coleman was being medically treated by HVA personnel, or (3) that Coleman was being detained by law enforcement officers.

*e.g.*, *City of Houston v. Hill*, 482 U.S. 451, 462-63 (1987); *McCurdy v. Montgomery County*, 240 F.3d 512, 520 (6th Cir. 2001). Accordingly, the Court shall continue its analysis regarding whether they may be subject to Section 1983 liability with respect to Plaintiff's post-Coleman Incident public criticisms.

       2.    *Chilling Effect?  HVA, Lloyd, West and Warner*

The Court next explores whether any Defendant(s) took any action regarding Plaintiff's protected First Amendment activity which would cause Plaintiff to suffer an injury that would "chill a person of ordinary fitness from" continuing to engage in that activity. As discussed above, the protected First Amendment activity is limited to her public criticisms that began the evening of November 30, 2006 and shall be presumed to have continued until the end of January 2007.

As to Lloyd, West and Warner, the Court has not been presented with any evidence that Lloyd, West or Warner engaged in any activity regarding the events surrounding the Tanter Speech and Coleman Incident, at least subsequent to the time Plaintiff began publicly criticizing the University of Michigan and the AAPD and UMDPS officers the evening of November 30, 2006. More specifically, there is no evidence that, once Warner and West completed their respective reports regarding the Tanter Speech/Coleman Incident on the evening of November 30, 2006,[5] Warner or West took any action with respect to Plaintiff or the incidents that occurred at the

_____

[5]West filed his report on November 30, 2006, and Warner dictated his report on November 30, 2006. Plaintiff has offered no evidence that her post-incident public criticism commenced prior to the preparation/narration of the reports by West/Warner, respectively (or how it was possible that West or Warner could have been aware that Plaintiff had commenced such public criticism before he completed his report). In other words, even if West's report or Warner's report was false and constituted an adverse action, such adverse action could not have been motivated by Plaintiff's protected conduct. Accordingly, the Court concludes, as a matter of law, that West and Warner did not retaliate against Plaintiff for the exercise of her First Amendment rights.

Michigan League on November 30, 2006. As their actions could not have had a chilling effect on Plaintiff's activity, the Court holds that West and Warner are entitled to summary judgment on Count I.

> 3.   *Chilling Effect of, and Motivation for, Actions of Conners, Matthews and Domeier*

For purposes of this Opinion only, the Court assumes, without deciding, that there is evidence in the record from which a reasonable fact finder could determine that each of Conners (supplemental police reports filed on December 1 and 16, 2006), Matthews (conducted investigation during December 2006/January 2007 and request for warrant made on January 2, 2007), and Domeier (discussions with Matthews after January 2, 2007):

> (a)   took actions in response to Plaintiff's public criticism of the governmental entities and officials involved in the Tanter Speech/Coleman Incident which would have a chilling effect on Plaintiff's constitutionally protected public criticisms, and

> (b)   was motivated to take such actions, at least in part, by the content of Plaintiff's constitutionally protected public criticisms of the University of Michigan, the AAPD and its officers, and the UMDPS and its officers.

> 4.   *Probable Cause*

With respect to all Defendants, Plaintiff contends that the actions they took in retaliation for the public criticisms she offered the evening of November 30, 2006, during December 2006 and in January 2007 were for the purpose of pursuing and/or maintaining the criminal charges filed against Plaintiff on January 23, 2007. In order to maintain a First Amendment action based on a retaliatory-prosecution, however, a plaintiff must plead and show the absence of probable cause for pressing the underlying criminal charge(s). *Hartman*, 547 U.S. at 265-66; *Barnes v. Wright*, 449 F.3d 709, 720 (6th Cir. 2009) (granting qualified immunity on a Section 1983 First Amendment retaliation claim because if "the defendants had probable cause to seek an indictment and to arrest [plaintiff]

on each of the criminal charges in this case[, plaintiff's] First Amendment retaliation claim . . . fails

as a matter of law").  As the United States Supreme Court stated recently:

> [A] retaliatory motive on the part of an official urging prosecution **combined with an absence of probable cause supporting the prosecutor's decision** to go forward are reasonable grounds to suspend the presumption of regularity behind the charging decision, see *Bordenkircher v. Hayes*, 434 U.S. 357, 364, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978) (emphasizing that "so long as the prosecutor has probable cause," the charging decision is generally discretionary), and enough for a prima facie inference that the unconstitutionally motivated inducement infected the prosecutor's decision to bring the charge.

*Hartman*, 547 U.S. at 265 (emphasis added).

Significantly, the decision of the prosecutor is entitled to a presumption of regularity with

respect to his or her prosecutorial decisionmaking.  *Hartman*, 547 U.S. at 263 (citing *Reno v.*

*American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 489-90 (1999)).  *See also United States*

*v. Armstrong*, 517 U.S. 456, 464-66 (1996)).  The "presumption that a prosecutor has legitimate

grounds for the action he takes is one that we do not lightly discard, given our position that judicial

intrusion into executive discretion of such high order should be minimal[.]"  *Hartman*, 547 U.S. at

263 (citing *Wayte v. United States*, 470 U.S. 598, 607-08 (1985)).

In this case, Plaintiff pled the absence of probable cause, but the Court finds that Plaintiff

has failed to offer any evidence that the Washtenaw County prosecutor would have concluded that

there was a lack of probable cause to file the misdemeanor charges against Plaintiff, even if all

Plaintiff asserted was true.  There is no evidence that any Defendant involved herself/himself/itself

in the decision of the Washtenaw County prosecutor to file the misdemeanor charges against

Plaintiff.  The undisputed evidence is that West and Warner prepared police reports on November

30, 2006, and Conners completed her reports by December 18, 2006.  There is no evidence that

Domeier communicated with any other Defendant prior to January 2, 2007, the date Matthews

18

forwarded the request for warrant to the Washtenaw County prosecutor. There is no evidence that, other than the request for warrant Matthews sent to the Washtenaw County prosecutor, West, Conners, Warner, Matthews or Domeier had any contact with the Washtenaw County prosecutor regarding Plaintiff prior to January 23, 2007, when the Washtenaw County prosecutor filed the misdemeanor charges against Plaintiff.

The Court now turns to Plaintiff's arguments that the Washtenaw County prosecutor would never have: (a) initially determined that there was probable cause to file the misdemeanor charges against Plaintiff but for West, Conners and Warner submitting false police reports regarding the Coleman Incident, or (b) continued the prosecution of Plaintiff but for Domeier's false statements that the use of "ammonia inhalants [was] not medically contraindicated."[6]

As to West,[7] Plaintiff contends that West made the following three "false" statements in his report:

> 1.  West failed to note in the report that Plaintiff demanded West and Conners turn Coleman onto his back.

---

[6]The Court notes that, were this case to proceed to trial, the admissibility of testimony regarding the removal of ammonia inhalants from HVA vehicles at some point after the Coleman Incident would be limited to the issue of whether Domeier's statements regarding their use in modern medicine is "not medically contraindicated." Evidence of the removal of ammonia inhalants from HVA vehicles at some point after the Coleman Incident would not be admissible for purposes of demonstrating that Lloyd's use of the ammonia inhalants on Coleman on November 30, 2006 was medically contraindicated.

[7]As discussed above, West filed his report on November 30, 2006. Plaintiff has offered no evidence that her post-incident public criticism commenced prior to the preparation of West's report (or how it was possible that West could have been aware that Plaintiff had commenced such public criticism before he completed his report). In other words, even if West's report was false and constituted an adverse action, such adverse action could not have been motivated by Plaintiff's protected conduct. Accordingly, as the Court concluded, West could not have retaliated against Plaintiff for the exercise of her First Amendment rights, as a matter of law.

       2.      West used the term "yell" to describe the volume of Plaintiff's comments at the Coleman scene.

       3.      West omitted Plaintiff's comments that the use of the ammonia capsules was "inefficacious and punitive."

The Court finds that West's report, as written, is not misleading *vis a vis* the charges filed against Plaintiff because West's report lacked items 1 and 3 (assuming they are true) or because the word "yell" was not the appropriate verb to use to describe Plaintiff's verbal communications. The Court also concludes that, even if each of these three items were included (or changed) in West's report such that West's report was written as Plaintiff desired, the substance of West's report would not be any different. In other words, even if: (a) West's report reflected that Plaintiff demanded that West and Conners turn Coleman onto his back, (b) West's report reflected that Plaintiff complained that the use of the ammonia capsules was "inefficacious and punitive," and (c) the term "yell" was changed to "tell" (Plaintiff does not specify what the appropriate word should be), the "revised" report would not have made a finding of probable cause any less likely.

      Conners filed three reports, one on each of November 30, 2006,[8] December 1, 2006 and December 18, 2006. Plaintiff contends that there were two "false" items in those reports, and both

---

[8]Conners' November 30, 2006, report does not reflect a time prepared. As with the November 30, 2006 report prepared by West, however, Plaintiff has offered no evidence that her post-incident public criticism commenced prior to the preparation of Conners' November 30, 2006 report (or how it was possible that Conners could have been aware that Plaintiff had commenced such public criticism before she completed her report). In other words, even if Conners' November 30, 2006 report was false and constituted an adverse action, such adverse action could not have been <u>motivated</u> by Plaintiff's protected conduct. Therefore, the Court concludes, as a matter of law, that Conners could not have retaliated against Plaintiff for the exercise of her First Amendment rights when preparing the November 30, 2006 report.

20

of them were in the November 30, 2006, report:[9]

    1.    The failure to note in the report that Plaintiff demanded West and Conners turn Coleman onto his back.

    2.    The misstatement that Plaintiff's t-shirt said, "Racist Imperialist" when it actually said "Resist Imperialism."

The Court finds that Conners' report, as written, is not misleading *vis a vis* the charges brought against Plaintiff because her report lacked item 1 (assuming it is true) and/or Conners wrote the wrong phrase emblazoned on Plaintiff's shirt. The Court also concludes that, even if both of these items were included (or changed) in Conners' report such that Conners' report was written as Plaintiff desired, the substance of Conners' report would not be any different. In other words, even if: (a) Conners' report reflected that Plaintiff demanded of West and Conners that Coleman be turned onto his back, and (b) Conners correctly noted the words on Plaintiff's shirt, the "revised" report would not have made a finding of probable cause any less likely.

As to Warner, Plaintiff argues that "Warner failed to include the material fact that [Plaintiff] was rendering medical care to Coleman pending the arrival of HVA." The absence of this "fact," even if it constituted an accurate depiction of an event that occurred, does not constitute evidence that Warner's report was false. An officer need not include every statement or action that occurred during an incident, and the absence of a "fact" does not necessarily render the report false. Moreover, even if Plaintiff was rendering medical care to Coleman pending the arrival of the HVA team, that "fact" does not show that Plaintiff was involved in–or had a right to be involved in–providing such care once the HVA team arrived. This is significant because the uncontroverted

---

        [9]In fact, the December 1, 2006 report and the December 18, 2006 report do not address Plaintiff in any manner and, as such, could not have had any bearing on the Washtenaw County prosecutor's decision to file–or not file–charges against Plaintiff.

evidence–whether it was from the statements of numerous persons at the scene of the Coleman Incident or Plaintiff's own deposition testimony–reflects that, except when West and Conners allowed Plaintiff to check Coleman's vital signs, Plaintiff was not rendering medical care to Coleman at any time.

Plaintiff also testified at her deposition that the following two statements in Warner's police report were false, stating that such events "just didn't happen:" (a) Plaintiff "was verbally abusive and combative toward police officers on the scene," and (b) "on five to six occasions, [Warner] specifically directed [Plaintiff] to . . . step back, and . . . stop attempting to push past officers in an attempt to communicate with the medical personnel." The Court finds that such statements would provide support for (*i.e.*, constitute evidence of probable cause) the two misdemeanor charges filed against Plaintiff.

"An action under § 1983 does lie against an officer who obtains an invalid search warrant by making, in his affidavit, material false statements either knowingly or in reckless disregard for the truth." *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989) (citations omitted). As such, Plaintiff "must make a preliminary showing that [Warner] engage in deliberate falsehood or reckless disregard for the truth in omitting information from,[10] or making false statements in," his report. *See Wolgast v. Richards*, 389 Fed. App'x 494, 502 (6th Cir. 2010) (citing *Hale v. Kart*, 396 F.3d 721, 725 (6th Cir. 2005) (omissions), and *Hill*, 884 F.3d at 275 (false statements)). The Court finds that Plaintiff has not made, and cannot make, a preliminary showing that Warner engaged in "deliberate

---

[10]In addition to the reasons set forth by the Court above, each of Plaintiff's challenges regarding "omissions" from the reports of West, Conners and Warner fails because Plaintiff has made <u>no</u> showing that such "omissions" were deliberate falsehoods or were omitted with a reckless disregard for the truth.

falsehood or reckless disregard for the truth."

Plaintiff's only argument to show Warner's mental state is that Warner included falsehoods about Plaintiff in his report "[b]ecause he knew that [Plaintiff] was going to file a complaint against him" and "so he could defend himself against the complaint."   The logic of this argument is deficient, as Warner prepared his report on the evening of November 30, 2006, prior to any protected First Amendment activity by Plaintiff and more than 45 days before Plaintiff filed her citizen's complaint against Warner.  More significantly, several other persons present at the scene of the Coleman Incident, including Lloyd, Jeffery Green ("Green") (the student building manager at the Michigan League who was present at the Coleman Incident) and numerous non-defendant UMDPS/AAPD officers on the scene offered versions of Plaintiff's and Warner's actions that were consistent with the "false" statements in Warner's report.  Lloyd and Green (as well as Warner) testified as such at Plaintiff's criminal trial, and the non-defendant officers reported as much in response to an investigation of Warner pursuant to Plaintiff's January 17, 2007 citizen's complaint filed with the AAPD.  Based on numerous persons describing the events related to Plaintiff at the scene of the Coleman incident in a manner consistent with "false" statements in Warner's report, the Court finds that Plaintiff has not made a preliminary showing that Warner's statements were "deliberate falsehoods" or made with "reckless disregard for the truth."

Moreover, even if the Court assumes that: (1) Plaintiff satisfied her burden of showing that Warner engaged in "deliberate falsehood or reckless disregard for the truth" in making those two statements, and (2) both statements are false, the Court cannot conclude that the Washtenaw County prosecutor would not have found probable cause to file the misdemeanor charges against Plaintiff absent the "false" statements made by Warner.  First, and most significantly, Plaintiff has simply

identified two statements she claims are false and makes the conclusory argument that there was not probable cause for the charges against her absent such statements.  Plaintiff has not presented the Court with: (a) the materials provided by Matthews to the Washtenaw County Prosecutor's Office on January 2, 2007, (b) the basis upon which the Washtenaw County prosecutor relied when determining that the misdemeanor charges should issue against Plaintiff (*i.e.*, whether it was solely police reports and other materials provided by Matthews and/or investigatory reports or findings made by the Washtenaw County prosecutor upon receiving the request for warrant).  In other words, Plaintiff has not provided the Court with the ability to look at the materials that the Washtenaw County prosecutor did and determine whether probable cause existed (after striking the "false" Warner statements).

Second, Plaintiff has not offered the testimony of the Washtenaw County prosecutor who filed the misdemeanor charges against Plaintiff (or any Washtenaw County prosecutor, or any other legal "expert") that the misdemeanor complaint, in whole or in part, would not have issued if either or both of Warner's "false" statements were never made.  Third, a review of the unchallenged portions of the police reports prepared by West and Conners, without more, allows for a determination that there was probable cause to file both misdemeanor charges against Plaintiff.

Plaintiff also alleges that Domeier is liable for the wrongful (continued) prosecution of Plaintiff because Domeier falsely represented that the use of ammonia inhalants to alleviate unconsciousness was an appropriate and widely used medical technique.  Domeier: (a) admits that he made such statements to Matthews in response to queries from Matthews regarding the practice of using ammonia inhalants, and (b) has continued to adhere to the legitimacy of that position throughout this lawsuit.  Here, the conduct at issue consists solely of Domeier's statements that

"ammonia inhalants are not medically contraindicated." Plaintiff's claim *vis a vis* Domeier fails for two reasons.

First, Plaintiff does not cite to the record or produce <u>any</u> evidence to support her contention that Domeier's statement ("that ammonia inhalants are not medically contraindicated") is false. Most significantly, Plaintiff does not offer any authoritative evidence (*e.g.*, any state or federal law or regulation, a medical treatise, medical control authority guidelines or protocol, etc.) that the use of ammonia inhalants by emergency medical personnel were: (1) medically unethical, (2) medically contraindicated, or (3) illegal in any manner, during 2006 or 2007. In addition, just because Plaintiff holds the opinion or belief that the use of ammonia inhalants is not considered appropriate in modern medicine and can be considered counterproductive or dangerous does not make that opinion or belief a true, undisputed fact. Likewise, although the HVA stopped using ammonia inhalants at some point after November 30, 2006 but before May 10, 2007 (and such fact <u>may</u> suggest that their use is not appropriate), the discontinuance of such ammonia inhalants does not establish that Domeier's statement ("ammonia inhalants are not medically contraindicated") was–or is–false.

Second, even assuming that what Domeier said is, in fact, false, the Court finds that "it would [not] be clear to a reasonable offic[ial] that [Domeier's] conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202. Most importantly, Plaintiff has offered no authoritative evidence from which the Court could delineate that Domeier knew or should have known that the use of ammonia inhalants was dangers, counterproductive or even inappropriate.

In light of the foregoing, the Court concludes that there is no evidence to support a finding that: (a) Domeier's statements were false, or (b) "it would be clear to a reasonable offic[ial] that [Domeier's] conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202.

25

Accordingly, the Court holds that Domeier is entitled to summary judgment, as well as qualified immunity, with respect to Plaintiff's claim that Domeier retaliated against Plaintiff for the exercise of her First Amendment rights.

For the foregoing reasons, the Court concludes that there was probable cause for the issuance of the misdemeanor charges - and the continued prosecution of Plaintiff.

  *5. Conclusion*

For the reasons set forth above, all Defendants are entitled to summary judgment with respect to Plaintiff's claim that Defendants retaliated against her for exercising her First Amendment rights.

**C. Count II - Unreasonable Search and Seizure
and Prosecution Without Probable Cause**

In her Complaint, Plaintiff alleges that her Fourth Amendment rights were violated in a number of ways:

> 55. The decision of Defendant WARNER to seize her even though she had not physically interfered and was voluntarily leaving the area upon the directions issued by him and Defendant LLOYD[11] was without probable cause.

> 56. Defendant WARNER's decision to physically grab her, push her against a wall and wrench her arm, injuring her, without probable cause and without any resistance by her, constituted an unreasonable seizure in the form of excessive force.

> 57. The decision of Defendant WARNER to detain her for a lengthy period of time in a stairwell without probable cause represented a continuation of the unreasonable seizure.

> 58. The false reports of Defendants WARNER, CONNERS and WEST regarding WILKERSON's activities that evening was used to obtain warrants against her and resulted in her prosecution, which could not have occurred but for those reports because there would have been a lack of probable cause. It represented a continuing

---

[11]As discussed above, Lloyd and HVA were not state actors and cannot be subject to Section 1983 liability.  Accordingly, it is not necessary for the Court to analyze Plaintiff's Count II allegations *vis a vis* Lloyd or HVA.

unreasonable seizure.

59. The acts of Defendants MATTHEWS and DOMEIER in falsely claiming that the use of ammonia inhalant to revive an unconscious person was not medically contraindicated as claimed by WILKERSON, particularly after Defendant HVA discontinued the use of such inhalants, contributed to the continued prosecution without probable cause of WILKERSON, particularly during and after her motions to dismiss.

60. As a result of the actions of the Defendants herein, Plaintiff suffered the damages set forth above.

Based on those allegations, the Court concludes that Plaintiff is asserting three categories of seizures by Defendants: (1) the conduct of Warner at the Michigan League on November 30, 3006 when he physically seized Plaintiff; (2) the police reports compiled by Warner, Conners and West with respect to the Tanter Speech/Coleman Incident that "represented a continuing unreasonable seizure"; and (3) the representations of Matthews and Domeier that the use of ammonia inhalants to revive an unconscious person was not medically contraindicated, which also "represented a continuing unreasonable seizure." As the Court ruled, neither Lloyd nor HVA is a state actor who could be liable pursuant to Plaintiff's claims in Count II.

### 1. The Physical Seizure at the Michigan League on November 30, 2006

Plaintiff has not alleged or offered any evidence that Domeier took any action in the course of the events at the Michigan League on November 30, 2006. Likewise, Plaintiff has not alleged or offered any evidence that West or Matthews caused Plaintiff to be detained at the Michigan League or that they were involved in any manner with Plaintiff's detention there. Plaintiff's Complaint alleges that Conners caused Plaintiff to be detained by Warner in the stairwell, however, there is no evidence to support a finding that Conners was involved in any part of that decision. Plaintiff testified that only Warner removed her from the scene of the Coleman incident and that

Warner did so only after hearing Lloyd say, "get her [Plaintiff] out of here." Likewise, during the time Plaintiff was detained in the stairwell, Plaintiff testified that the only involvement of Conners was the following dialogue:

> Q.    And when [Conners] arrived there, what did she say to you, if anything?
>
> A.    She asked me if I wanted to give a statement, and I said I wanted to go home. And she got out her business card and she told me that, if I wanted to make a statement, I could call her.
>               And I said, am I free to go now? And she said yes.

The Court finds that such dialogue does not constitute evidence that any reasonable finder of fact could conclude that Conners detained Plaintiff in any manner at the Michigan League. For these reasons, the Court concludes that Domeier, West, Conners and Matthews cannot be subject to liability for the detention of Plaintiff at the Michigan League. Thus, the only remaining Defendant to address is Warner.

### a.  Reasonable Suspicion and Probable Cause for Seizure

Although there are conflicting accounts of the circumstances surrounding Warner's removal of Plaintiff from the scene of the Coleman Incident, there is no dispute that Warner: (1) ultimately caused Plaintiff's arm(s) to be put behind her back, (2) escorted her away from the treatment area, and (3) detained Plaintiff in a nearby stairwell for a period of time. It is likewise undisputed that Plaintiff was permitted to leave the stairwell and was not placed under arrest on November 30, 2006. Plaintiff contends that Warner: (a) seized her without probable cause, (b) used excessive force, and (c) detained her for an extended period without probable cause.

When an officer develops "reasonable suspicion" that criminal activity may be taking place, the officer may conduct a limited seizure and detain a person for investigative purposes. *Terry v.*

*Ohio*, 392 U.S. 1, 30-31 (1968).  A *Terry* stop must be "reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Perez*, 440 F.3d 363, 372 (6th Cir. 2006).  The detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Id.*  "The investigative means used should also be the least intrusive means reasonably available to verify or dispel the officer's suspicions in a short period of time." *Id.* "When police actions go beyond checking out the suspicious circumstances that led to the original [*Terry*] stop, the detention becomes an arrest that must be supported by probable cause." *United States v. Obasa*, 15 F.3d 603, 607 (6th Cir. 1994). "Courts consider the length of the detention, the manner in which it is conducted, and the degree of force used in determining whether an investigative stop is 'reasonably related to the basis for the original intrusion.'" *Smoak,* 460 F.3d at 781 (quoting *Houston v. Clark County Sheriff Deputy John Does 1-5,* 174 F.3d 809, 814 (6th Cir. 1999)).

In this case, the Court finds that Warner's detention of Plaintiff was "reasonably related in scope to the circumstances which justified the interference in the first place."  Warner not only had reasonable suspicion that criminal activity was afoot, he had probable cause to believe that Plaintiff was engaged in criminal activity.  As detailed in the police report Warner prepared immediately after the events on November 30, 2006 (and as numerous other officers relayed to the AAPD sergeant who investigated Plaintiff's citizen's complaint against Warner in January/February 2007), and as Warner, Lloyd and Green testified at the criminal trial, Warner had reason to believe Plaintiff was interfering with the ability of the HVA personnel to administer care to Coleman.  For example, Lloyd testified that on at least three occasions, he asked Plaintiff to move away from where HVA personnel were treating Coleman.  Green gave similar testimony.  Officers Whitehead and Lawson

29

of the AAPD both stated that Warner repeatedly directed Plaintiff to move away from Coleman but that Plaintiff either outright ignored him or, even when she did move back, she did so only for a moment before re-entering the area where Coleman was being treated. Each of these persons indicated that Coleman was yelling during this time period.

Based on the foregoing, the Court finds that, among other criminal activity that a police officer could have reasonably suspected Plaintiff of, Warner had "reasonable suspicion" and "probable cause" to believe that Plaintiff was violating M.C.L. § 750.81d(1) at the scene of the Coleman Incident. M.C.L. § 750.81d(1) provides (emphasis added):

> [A]n individual who assaults, batters, wounds, resists, **obstructs**, opposes, or endangers a person who the individual knows or has reason to know is performing his or her duties is guilty of a felony punishable by imprisonment for not more than 2 years or a fine of not more than $2,000.00 or both.

A "person" under Section 750.81d(1) includes "[a]ny emergency medical service personnel . . ." M.C.L. § 750.81d(7)(b)(vii). Lloyd and the other HVA emergency personnel clearly come within the definition of person. "Obstruct" includes the use or threatened use of physical interference or a knowing failure to comply with a lawful command. M.C.L. § 750.81d(7)(a). Thus, contrary to Plaintiff's interpretation of Section 750.81d(1), the statute does not require that an individual **physically interfere** with a person performing his or her duties. Rather, an individual can obstruct emergency personnel simply by the "knowing failure to comply with a lawful command."

In this case, Warner has (and many others have) testified that Plaintiff did not comply with Warner's (or Lloyd's) commands to Plaintiff that she had to move away from area where Coleman was being treated by HVA personnel. Moreover, as Plaintiff was not engaged in protected constitutional activity while at the Coleman Incident, any command by Warner (or Lloyd) to move away from the treatment area constituted a lawful command. Finally, as Plaintiff did not comply

with verbal commands of Warner and Lloyd to remove herself from the treatment area, it was not unreasonable for Warner to use limited physical means to escort Plaintiff away from the scene of the Coleman incident. As such, the Court finds that the manner in which the detention was conducted was "reasonably related to the basis for the original intrusion."

For the reasons set forth above, the Court concludes that, as it relates to Warner removing Plaintiff from the scene of the Coleman Incident, it would not have been "clear to a reasonable officer that his conduct was objectively unreasonable in light of the clearly established constitutional rights" of Plaintiff.

### b. No Excessive Force

Plaintiff's allegations of excessive force by Warner cannot withstand the motion for summary judgment as the degree of force used by Warner was "reasonably related to the basis for the original intrusion." The Fourth Amendment requires that an officer's use of force be objectively reasonable, and courts must balance the consequences to the individual against the government's interests in effecting the seizure. *Graham v. Connor*, 490 U.S. 386, 396 (1989). "[T]he objective-reasonableness standard . . . depends on the facts and circumstances of each case viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight." *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007) (citing *Graham*, 490 U.S. at 395-96). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. "Relevant considerations include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting

31

to evade arrest by flight.'" *Fox*, 489 F.3d at 236 (quoting *Graham*, 490 U.S. at 396).

Here, the undisputed evidence is that Warner grabbed Plaintiff's wrists and put them behind her back, then marched her out of the area where the Coleman Incident was taking place and into a stairwell. The evidence is also undisputed that once Warner got Plaintiff in the stairwell, he released her wrists, he did not handcuff Plaintiff, and he did not use any physical force against Plaintiff thereafter. In addition, although Plaintiff alleged injury in her Complaint, <u>there is no evidence</u> that Plaintiff was injured as a result of Warner's actions. Plaintiff did not go see a doctor afterward; rather, she simply prescribed physical therapy for herself–the same physical therapy treatment she was receiving shortly before the Coleman Incident occurred. For the foregoing reasons, the Court finds that the degree of force used by Warner against Plaintiff under the circumstances "was objectively []reasonable in light of the clearly established constitutional rights" of Plaintiff.

### c. Length of Detention Was Reasonable

Finally, even assuming that Plaintiff was detained for 30 minutes, the Court finds that the length of detention was "reasonably related to the basis for the original intrusion." Warner took Plaintiff into the stairwell to remove her from interfering with the medical care being administered to Coleman. As such, it was not unreasonable to detain her for a period simply to keep her from the treatment area (or, alternatively, arrest her at that time). In addition, as Warner had reasonable suspicion and probable cause to believe Plaintiff engaged in criminal activity, it was not unreasonable for Warner to hold Plaintiff until the officer in charge (Conners) made a decision on whether to arrest Plaintiff. Plaintiff has testified that she was detained for approximately 20 minutes before Conners approached her. In light of the many situations occurring at that time (the

32

treatment/arrest of Coleman, an area full of protesters and onlookers, the Tanter Speech), the Court concludes that 20 minutes was not an unreasonable period of time for Conners to reach Plaintiff and Warner. Even if Plaintiff was detained, but not arrested, for an additional 10 minutes after Conners interacted with Plaintiff, the Court cannot find that Warner acted unreasonably in continuing her detention for an additional 10 minutes, especially as there is no evidence that Warner was aware that Conners told Plaintiff she was free to go.

### d.  Conclusion

For the reasons discussed above, the Court concludes that Warner is entitled to qualified immunity with respect to Plaintiff's claims that her Fourth Amendment rights were violated when Warner seized and detained her at the Michigan League on November 30, 2006.

### 2.  *The Continuing Unreasonable Seizures*

In the Sixth Circuit, a cause of action for continuing unreasonable seizure exists only "throughout the time the person remains in the custody of the arresting officers." *Johnson v. City of Cincinnati*, 310 F.3d 484, 492 (6th Cir. 2002) (quoting *McDowell v. Rogers*, 863 F.2d 1302, 1306 (6th Cir. 1988)). The Sixth Circuit has "not yet explicitly addressed whether the seizure could continue past this point." *Johnson*, 310 F.3d at 492. Other circuits have held that a seizure could continue past the point of a person being held in custody, however, even in those cases, the courts held that there must be a restriction of movement in order for there to be a "seizure." *See Johnson*, 310 F.3d at 493 (citations omitted) ("in each of the cases addressed by our sister circuits, the government not only curtailed the suspect's right to interstate travel, it also imposed additional restrictions designed to compel an ultimate court appearance, such as obligations to post bond, attend court hearings, and contact pretrial services"). These rulings are consistent with the rule

33

established by the U.S. Supreme Court over 30 years ago. *See United States v. Mendenhall*, 446 U.S. 544, 553 (1980) ("We adhere to the view that a person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained.").

In this case, Plaintiff has not pled, let alone submitted evidence, that her movement was restricted in any manner subsequent to the time she left the Michigan League on November 30, 2006. Accordingly, to the extent Count II is based on "a continuing unreasonable seizure" after she left the Michigan League on November 30, 2006, the Court holds that Plaintiff has failed to state a claim upon which relief can be granted. Therefore, the Court concludes that all Defendants are entitled to summary judgment with respect to her two claims of "continuing unreasonable seizure" in Count II.

     *3.    Conclusion*

For the reasons set forth above, all Defendants are entitled to summary judgment with respect to Count II of Plaintiff's Complaint.

**D.    Count III - Conspiracy to Violate Civil Rights**

A civil conspiracy requires:

     (1)    a single plan;

     (2)    that the alleged co-conspirator shared in the general conspiratorial objective;

     (3)    an overt act that was committed in furtherance of the conspiracy; and

     (4)    that the plaintiff was injured by the conspiracy.

*Hooks v. Hooks*, 771 F.2d 935, 943 (6th Cir. 1985). As the *Hooks* court stated:

> A civil conspiracy is an agreement between two or more persons to injure another by unlawful action. Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved. All that must be

shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.

*Id*. at 943-44. Qualified immunity may be granted on a civil conspiracy claim where the court determines that plaintiff suffered no underlying constitutional harm, *Revis v. Meldrum*, 489 F.3d 273, 286-87 (6th Cir. 2007), or where a defendant is entitled to qualified immunity on the underlying constitutional claim. *Scott v. Churchill*, 377 F.3d 565, 572 (6th Cir. 2004).

In this case, the Court has determined that the only protected activity for which Plaintiff could have suffered a constitutional harm is her public criticisms on the evening of November 30, 2006, during December 2006 and in January 2007. As discussed above, Lloyd and HVA are not state actors and cannot be subject to Section 1983 liability, including for Plaintiff's civil conspiracy claim in Count III. The Court also has determined that West, Conners, Matthews, Domeier and Warner did not cause Plaintiff to suffer any constitutional harm and/or are entitled to qualified immunity with respect to the claims Plaintiff asserted in Counts I and II. Accordingly, West, Conners, Matthews, Domeier and Warner are entitled to qualified immunity and summary judgment with respect to Plaintiff's Section 1983 civil conspiracy claim.

## V. COUNT IV - ASSAULT AND BATTERY

In Michigan, assault means: (1) an intentional unlawful offer of corporal injury to another person by force, or force unlawfully directed toward the person of another, (2) under circumstances which creates a well-founded apprehension of imminent contact, (3) coupled with the apparent present ability to accomplish the contact. *VanVorous v. Burmeister*, 262 Mich.App. 467, 482 (2004).

35

Battery is defined as a "willful and harmful or offensive touching of another person, which results from an act, intended to cause such a contact." *Id.* at 482. If a police officer uses reasonable force in a lawful detention, however, the use of force will not constitute an illegal act, such as an assault. *Delude v. Raasakka*, 391 Mich. 296, 302 (1974 ("the right to arrest and detain carries with it the right to use reasonable force in case of resistance"). In fact, in Michigan, courts recognize that a police officer's decision to employ force should be granted a degree of deference. *Brown v. Shavers*, 210 Mich.App. 272, 276 (1995) ("Police officers . . . must be given a wide degree of discretion in determining what type of action will best ensure the safety of the individuals involved and the general public, the cessation of the unlawful conduct, and the apprehension of wrongdoers.").

Plaintiff contends that Warner lacked any reasonable, articulable basis (and lacked probable cause) to believe that Plaintiff was involved in criminal activity. As such, Plaintiff argues that Warner's initial detention of Plaintiff could not be justified as a *Terry* stop and that the duration (30 minutes according to Plaintiff) was unjustifiable under the circumstances. As discussed in Section IV.C.1.a. above, however, the Court concluded that Warner had reasonable suspicion, and probable cause, to believe that Plaintiff was engaged in criminal activity (specifically, acting in violation of M.C.L. § 750.81d(1)). Likewise, the Court concluded that, in light of the circumstances with which he was confronted, Warner did not use an unreasonable amount of force against Plaintiff or detain Plaintiff for an unreasonable period of time. *See* Section IV.C.1.b. & c. Accordingly, the Court concludes that Plaintiff's state law assault and battery claim fails as a matter of law.

## VI.  COUNT V - FALSE IMPRISONMENT

The Fourth Amendment protection against unreasonable searches and seizures is the basis

for an analysis of the claim of false imprisonment under Michigan law. *People v. LoCicero (after remand)*, 453 Mich. 496, 501 (1996). False imprisonment means an unlawful restraint on a person's liberty or freedom of movement. *Walsh v. Taylor*, 263 Mich.App. 618, 627 (2004); *Clarke v. K-Mart Corp.*, 197 Mich.App. 541, 546 (1993). For an imprisonment to be false, the person who imprisoned the plaintiff must not have had the right or authority to do so. *Moore v. City of Detroit*, 252 Mich.App. 384, 388 (2002). In *LoCicero*, the Michigan Supreme Court set forth the test for lawful detention:

> The brief detention of a person following an investigatory stop is considered a reasonable seizure if the officer has a "reasonably articulable suspicion" that the person is engaging in criminal activity. <u>The reasonableness of an officer's suspicion is determined case by case on the basis of the totality of all the facts and circumstances.</u> In determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and un-particularized suspicion or "hunch," but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.

*LoCicero*, 453 Mich. at 501-02 (emphasis added). *See also People v. Oliver*, 464 Mich. 184, 192; 627 N.W.2d 297 (2001); *People v. Jenkins*, 472 Mich. 26, 32; 691 N.W.2d 759 (2005); *People v. Custer*, 465 Mich. 319, 327; 630 N.W.2d 870 (2001).

As discussed above, the Court finds that Warner had the right to detain or even "imprison" Plaintiff. Warner was on active duty, serving in his capacity as a police officer for the AAPD at the time he detained Plaintiff on November 30, 2006. Moreover, as discussed above, (1) Warner had reason to suspect, as well as probable cause to believe, that Plaintiff was engaged in criminal activity, and (2) Warner did not unreasonably seize Plaintiff under the Fourth Amendment. Therefore, based on *LoCicero* and the Court's conclusions above, the Court concludes that Plaintiff's false imprisonment claim fails as a matter of law.

## VII. COUNT VI - MALICIOUS PROSECUTION

Under Michigan law, a plaintiff must prove the following in order to establish a claim of malicious prosecution:

(1)      Defendant has initiated a criminal prosecution against plaintiff,

(2)      The criminal proceedings terminated in Plaintiff's favor,

(3)      The person who instituted, continued or maintained the prosecution lacked probable cause for his actions, and

(4)      The action was undertaken with malice or a purpose in instituting the criminal claim other than bringing the offender to justice.

*Matthews v. BCBSM*, 572 N.W.2d 603, 609-10 (Mich. 1998); *Friedman v. Dozorc*, 312 N.W.2d 585 (Mich.Ct.App. 1981). In cases against police officers, Michigan courts have established that "the only situation in which an action for malicious prosecution would properly lie is where a police officer knowingly swears false facts in a complaint, without which there is no probable cause." *Matthews*, 572 N.W.2d at 615 (quoting *Belt v. Ritter*, 171 N.W.2d 581, 586 (Mich. Ct. App. 1969) (emphasis added)).

There is no allegation or evidence in this case that any police officer "knowingly sw[ore] false facts in a complaint." Moreover, as set forth in Section IV.B.4. above, there is no evidence that any Defendant knowingly made any false statements, whether it was in a written report or oral communication to someone investigating the events stemming from the Coleman Incident. Likewise, there is no evidence that there was an absence of probable cause for anyone who instituted, continued or maintained the prosecution against Plaintiff.

Accordingly, the Court holds that Plaintiff cannot establish a prima facie case of malicious prosecution. The Court therefore grants summary judgment to all Defendants with respect to Count

VI of Plaintiff's complaint.

## VIII.  MOTION TO AMEND COMPLAINT

Plaintiff desires to amend her complaint to add a Fifth Amendment (*Brady* violation) claim against Matthews.  The alleged basis for this proposed claim is that neither Matthews nor Margaret Connors (the Washtenaw County prosecutor) ever disclosed to Plaintiff's counsel the discontinuance of the use of ammonia inhalants by HVA.  Plaintiff asserts that HVA's removal of ammonia inhalants from its vehicles constituted exculpatory evidence with respect to the criminal case against Plaintiff because, according to Plaintiff, the ammonia capsules used by Lloyd are not considered to be appropriate for use in modern medicine and can be considered counterproductive or dangerous. For purposes of this Opinion, the Court shall assume, without deciding, that such evidence was exculpatory.  For the reasons that follow, the Court concludes that Plaintiff's motion to amend complaint should be denied.

In a case where a responsive pleading has been filed, a party may amend its pleading only with the written consent of the opposing party or by leave of the Court. FED. R. CIV. P. 15(a)(2). Defendant does not concur in Plaintiff's motion; therefore, it is within the Court's discretion whether to grant Plaintiff's motion to amend complaint.  Pursuant to Rule 15(a)(2), "leave shall be freely given when justice so requires."  The factors a court is to consider when determining whether to permit a plaintiff to file an amended complaint are:

(1)     the delay in filing the motion,

(2)     the lack of notice to the other party,

(3)     bad faith by the moving party,

(4)     repeated failure to cure deficiencies by previous amendments,

(5)     undue prejudice to the opposing party, and

(6)     futility of the amendment.

*Perkins v. Am. Elec. Power Fuel Supply, Inc.*, 246 F.3d 593, 605 (6th Cir. 2001).  A district court may deny a plaintiff leave to amend his or her complaint when the proposed amendment would be futile. *See, e.g., Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 569 (6th Cir. 2003) (citing *Foman v. Davis*, 371 U.S. 178 (1962)).

The Court first notes that, on May 10, 2007 via e-mail, Matthews notified Margaret Connors, a Washtenaw County prosecutor handling Plaintiff's criminal case, that Domeier had notified Matthews that HVA no longer used ammonia inhalants in HVA vehicles.  In her motion to amend complaint, Plaintiff acknowledged that Matthews disclosed this information to Margaret Connors on the same day Domeier told Matthews. *See* Motion to Amend Complaint, at ¶¶ 6 and 7.  As such, the Court finds that, as a matter of law, Domeier fulfilled his duty - he disclosed the exculpatory evidence to the prosecutor on the case. *See, e.g.*, *Moldowan v. City of Warren*, 578 F.3d 351, 381 (6th Cir. 2009):

> Although the prosecutor's office bears primary responsibility for carrying out the state's actual disclosure obligations under *Brady*, the police bear, as the Eighth Circuit has put it, an equally important "Brady-derived' responsibility to turn over potentially exculpatory evidence to the prosecutor's office.

*See also Steidl v. Fermon*, 494 F.3d 623, 631 (7th Cir. 2007) (citations omitted) ("investigators satisfy their obligation under *Brady* when they turn exculpatory and impeachment evidence over to the prosecutor").  Accordingly, the Court denies Plaintiff's motion to amend complaint on the basis that Plaintiff seeks to add a futile claim.

The Court also notes that Plaintiff has known that ammonia inhalants were removed from

40

HVA vehicles at least since July 2007, when she sought to have the criminal complaint against her dismissed because ammonia inhalants were inefficacious, as evidenced by their removal from the HVA vehicles. Plaintiff has also admitted in her motion to amend complaint that she "learned during the criminal proceedings in 2007 that the use of the ammonia inhalants had been discontinued by Defendant . . ." *See* Motion to Amend Complaint, at ¶ 3. Thus, well before her criminal trial was conducted in December 2007, Plaintiff knew that the ammonia capsules had been removed from the HVA vehicles. Likewise, Plaintiff knew that HVA had removed ammonia inhalants from its vehicles for more than two years prior to filing the instant cause of action. In addition, at least six months before filing the motion to amend complaint, depositions of Domeier and Matthews were conducted, at which depositions Plaintiff's counsel knew of Matthews' communication to Margaret Connors in May 2007. Finally, this case had been open for 18 months–and the discovery period was closed–before Plaintiff filed her motion to amend complaint.

As such, the Court finds that there was no excuse for Plaintiff's failure to plead this claim when the original complaint was filed (or at some point long before the motion to amend complaint was filed). Based on the foregoing, the Court holds that Plaintiff's motion to amend complaint is also denied because allowing the untimely claim would result in undue prejudice to, and an unwarranted burden on, the Court and the parties, namely Defendants.

## IX. CONCLUSION

Accordingly, and for the above reasons, IT IS HEREBY ORDERED that:

1.  The Motion to Amend Complaint filed by Plaintiff (Docket #39) is DENIED;

2.  The Motion for Summary Judgment filed by Janet Conners, Michael Matthews and Mark West (Docket #40) is GRANTED;

41

3.    The Motion for Summary Judgment filed by Dean Lloyd, Dr. Robert Domeier and Huron Valley Ambulance, Inc. (Docket #42) is GRANTED; and

4.    The Motion for Summary Judgment filed by Kevin Warner is GRANTED (Docket #44).

IT IS FURTHER ORDERED that Plaintiff's Complaint is hereby DISMISSED WITH PREJUDICE.

Judgment shall be entered accordingly.

IT IS SO ORDERED.


S/Lawrence P. Zatkoff
LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

Dated:  March 29, 2012

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on March 29, 2012.


S/Marie E. Verlinde
Case Manager
(810) 984-3290

42